J-A10039-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| SDSP, LLC AND WPHS VENTURE PARTNERS, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellants | : | |
| v. | : | |
| | : | No. 1029 EDA 2022 |
| MOSHE ATTIAS, MOSES CONSTRUCTION, INC., AAA DEMOLITION AND RECYCLING A/K/A HDS, INC., EDEN PLUMBING AND HVAC, INC., AND IAN MACLEAN v. | : | |
| ALAIN KODSI, RACHEL FOSTER AND ANDREW BANK | : | |

Appeal from the Judgment Entered March 17, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180402001

| MOSES CONSTRUCTION, INC., AAA DEMOLITION AND RECYCLING A/K/A HDS, INC., EDEN PLUMBING AND HVAC, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| | : | No. 1030 EDA 2022 |
| SDSP, LLC, WPHS VENTURE PARTNERS, LLC, ALAIN KODSI RACHEL FOSTER AND ANDREW BANK | : | |
| APPEAL OF: SDSP, LLC AND WPHS VENTURE PARTNERS, LLC | : | |

Appeal from the Judgment Entered March 14, 2022

J-A10039-23

In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  181202056

| | | |
|---|---|---|
| SDSP, LLC AND WPHS VENTURE PARTNERS, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MOSHE ATTIAS, MOSES CONSTRUCTION, INC., AAA DEMOLITION AND RECYCLING A/K/A HDS, INC., EDEN PLUMBING AND HVAC, INC., AND IAN MACLEAN | : | No. 1113 EDA 2022 |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALAIN KODSI, RACHEL FOSTER AND ANDREW BANK | : | |
| | : | |
| | : | |
| APPEAL OF: MOSHE ATTIAS, MOSES CONST., INC., AAA DEMO & RECYCLING  A/K/A HDS, INC., EDEN PLUMB. AND HVAC, INC. | : | |

Appeal from the Judgment Entered March 17, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  180402001

| | | |
|---|---|---|
| MOSES CONSTRUCTION, INC., AAA DEMOLITION AND RECYCLING A/K/A HDS, INC., EDEN PLUMBING AND HVAC, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1114 EDA 2022 |
| | : | |
| | : | |

- 2 -

J-A10039-23

| | |
|---|---|
| SDSP, LLC, WPHS VENTURE PARTNERS, LLC, ALAIN KODSI RACHEL FOSTER AND ANDREW BANK | : : : : : : |
| APPEAL OF: MOSHE ATTIAS, MOSES CONSTRUCTION, INC., AAA DEMO & RECYCLING A/K/A HDS, INC., EDEN PLUMB. AND HVAC, INC. | : : |

Appeal from the Judgment Entered March 14, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  181202056

BEFORE:   PANELLA, P.J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JUNE 20, 2023**

This matter involves an appeal and cross-appeal from a judgment entered on March 14, 2022, in the Court of Common Pleas of Philadelphia County against Appellants/Cross-Appellees SDSP, LLC ("SDSP") and WPHS Venture Partners, LLC ("WPHS") (collectively "SDSP/WPHS") and in favor of Appellees/Cross-Appellants AAA Demolition & Recycling, Inc. ("AAA Demo"), Moses Construction, Inc. ("Moses Construction"), Eden Plumbing & HVAC, Inc. ("Eden Plumbing"), and Moshe Attias ("Attias") (collectively "Subcontractors") for $3,227,079.59.  Additionally, the trial court entered judgment on March 17, 2022, in favor of SDSP/WPHS and against Attias, individually, in the

---

[*] Former Justice specially assigned to the Superior Court.

- 3 -

amount of $75,000.00 in relation to SDSP/WPHS's claim of conversion.[1] After a careful review, we reverse in part and affirm in part the trial court's January 21, 2022, order, vacate the March 14, 2022, judgment, and remand for further proceedings consistent with this decision. We affirm the March 17, 2022, judgment.

The trial court has set forth the relevant facts and procedural history, in part, as follows:

[SDSP/WPHS][2] filed a Complaint against [Subcontractors].[3], [4] SDSP/WPHS thereafter filed an Amended Complaint on June 5, 2018.

On January 19, 2019, [Subcontractors] filed an Answer to the Amended Complaint that included Counterclaims. On February 4, 2018, [Subcontractors] filed a separate cause of action against SDSP, WPHS, [and] Alain Kodsi ("Kodsi")…as well

---

[1] No party has raised a specific issue related to the trial court's January 21, 2022, order pertaining to the claim of conversion or the subsequent March 17, 2022, judgment.

[2] SDSP/WPHS were the initial Plaintiffs in the trial court while Subcontractors were the initial Defendants in the trial court. As discussed below, Subcontractors filed a separate cause of action against SDSP/WPHS, and the trial court consolidated the matters.

[3] SDSP/WPHS also named Ian MacLean "(MacLean)" as a defendant; however, on May 11, 2020, and May 19, 2020, the trial court granted MacLean's motion for summary judgment and dismissed MacLean from this action.

[4] Attias is the sole owner of AAA Demo, Moses Construction, and Eden Plumbing. SDSP/WPHS named Attias individually, as well as his three companies, as Defendants.

as Andrew Bank ("Bank") and Rachel Foster ("Foster").[5] On May 3, 2019, the [trial] court consolidated both cases for purposes of trial.

On May 11, 2020, [upon cross-motions for summary judgment,] the [trial] court entered an Order dismissing many of the causes of action in both cases so that the only causes of action that remained [for trial were]: (1) Count I of [SDSP/WPHS's] Complaint—claim of breach of contract against AAA Demo, Moses Construction, and Eden Plumbing; (2) Count III of [SDSP/WPHS's] Complaint—claim of conversion against Attias individually; (3) Count V of [SDSP/WPHS's] Complaint—claim of unjust enrichment against [Subcontractors]; (4) Count II of [Subcontractors'] Complaint—claim of breach of contract against SDSP; (5) Count III of [Subcontractors'] Complaint—claim of alleged violations of the Payment Act[6] against SDSP and WPHS; and (6) Counts IV and V of [Subcontractors'] Complaint for unjust enrichment/quantum meruit as to WPHS only.

[On October 13, 2021, the matter proceeded to a non-jury bench trial, which lasted thirteen days.]

Trial Court Opinion, filed 1/27/22, at 1-2 (footnotes added).

At trial, Bank testified he and Foster are real estate developers, and "WPHS is an operating entity that [they] setup initially to purchase property." N.T., 10/13/21, at 9. In February of 2015, WPHS purchased the West Philadelphia High School Building for $5.1 million from the School District of Philadelphia. *Id.* at 21. Thereafter, Bank and Foster brought on a tax credit investor, which holds a 99% interest in WPHS through one of its entities, AHP Housing Fund 94, LLC. *Id.* Bank and Foster each have a one-half percent

---

[5] By order entered on May 11, 2020, and May 19, 2020, the trial court granted motions for summary judgment, thus dismissing the claims against Kodsi, Foster, and Bank.

[6] Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. §§ 501-516.

(.5%) equity interest in WPHS through 4700 Walnut Street GP, which is the managing member of WPHS. *Id.*

Bank testified WPHS purchased the high school building with the objective of converting it into apartments during a three-phase process, known as the West Lofts Project ("the Project"). *Id.* at 13. SDSP was formed to act as the general contractor for the Project after Bank and Foster decided to "build it themselves," with Foster owning 51% and Bank owning 49% of SDSP. *Id.* at 10-11.

Both WPHS and SDSP operated out of the Brooklyn office of Foster's real estate firm, Heights Advisors. N.T., 10/14/21, at 118. WPHS had no employees while SDSP had three to five employees working on the Project with one employee, MacLean, on site. *Id.* at 117-18. Bank testified he directly managed the Project, and initially, he was in Philadelphia weekly or daily to oversee construction. N.T., 10/13/21, at 14-16. Foster remained more of a passive investor with only occasional visits to the site. *Id.*

Bank testified Harman Deutsch Architecture ("Architect") was enlisted to serve as the architect on the Project, and drawings for phase one of the Project were completed on September 29, 2015. *Id.* at 22. As of the time of trial, WPHS had completed the first and second phases of the Project, and the building had an occupancy rate of approximately 70%. *Id.* Bank testified the reason for the instant litigation related to phase one of the Project, which

involved conversion of the eastern half of the high school building into apartment units. *Id.* at 3, 9, 14.

The total construction budget for phase one was approximately $16 million, which included $13 million in "hard costs" and $3 million in "soft costs."[7] *Id.* at 25-26. To finance the construction of phase one, WPHS obtained a bank loan from Midfirst Bank for $12 million, which was based on an estimate Bank received from a Philadelphia-based construction company, Pancoast & Clifford, after it reviewed Architect's drawings. N.T., 10/14/21, at 126, 131. The Project was also eligible for a tax credit due to the building's historical status, and WPHS received approximately $7.6 million from the tax credit. *Id.* at 127.

Demolition for phase one began in 2015. N.T., 10/13/21, at 32. Bank testified that, at some point, SDSP became dissatisfied with the original demolition company, so Bank reached out to Attias, who was the owner of AAA Demo, and asked him to finish the demolition work for phase one. *Id.* at 36-37. On September 15, 2015, SDSP and AAA Demo signed a contract whereby SDSP agreed to pay AAA Demo $500,000.00, and AAA Demo began to work on the Project. *Id.* at 37. Bank testified AAA Demo was fully paid for

---

[7] "Hard costs" are costs that are either installed or affixed to the building or installed by a contractor or subcontractor. *Id.* at 26. "Soft costs" involve items such as furnishings, the payment of consultants, and marketing expenses. *Id.* Of the "hard costs," $6.3 million were paid to Subcontractors. N.T., 10/19/21, at 75-76.

the demolition work in accordance with the contract for phase one. *Id.* at 38.

He noted AAA Demo was actually paid $560,000.00 for the demolition work in

phase one because of two construction change orders, which were made while

the phase one demolition contract was in effect. *Id.* at 39. Demolition work

for phase one was completed by the end of 2015.[8]

Bank testified that, at the time the demolition work was being performed

for phase one, neither WPHS nor SDSP had entered into any contracts with

other subcontractors for the Project, although they were taking bids. *Id.* at

40. Attias, who owned Moses Construction and Eden Plumbing in addition to

owning AAA Demo, submitted bids, and SDSP entered into eleven trade

subcontracts with Attias for Moses Construction and Eden Plumbing to perform

a variety of construction work, including painting, carpentry, masonry,

plumbing, flooring, structural steel, HVAC, tiling, and window installation.[9] *Id.*

at 41-44. The trade subcontracts were drafted by Bank, who was not an

attorney, and modeled on standard industry agreements. *Id.* at 48. The

---

[8] Bank admitted he had a verbal agreement with AAA Demo whereby AAA Demo would perform demolition work for phase two of the Project, and SDSP/WPHS would pay a certain amount weekly based on invoices submitted by Attias. N.T., 10/14/21, at 141. AAA Demo began demolition work for phase two in 2017 pursuant to the verbal agreement. *Id.* Bank testified all invoices submitted by Attias for the phase two demolition work were paid. *Id.* at 142. Bank testified the demolition work done after 2015 was not based on the initial contract, which was solely for phase one. *Id.* at 141.

[9] The electrical work and the installation of the fire sprinkler system were not done by any entity owned by Attias. N.T., 10/19/21, at 75-76. This work was included in the budget for "hard costs." *Id.*

trade subcontracts were often not fully "filled in," but each contained similar terms, except for different scopes of work and payment amounts. *Id.* at 44-45, 46-48.

Bank testified the payment amount in the trade subcontracts covered labor, materials, tools, supplies, insurance, supervision, etc.; however, sometimes Subcontractors were not paid the full amount because SDSP deducted the amount it paid for materials. *Id.* at 46-47. Bank testified that, after the contracts were signed, "it became clear that [Subcontractors] couldn't…afford to be out of pocket" for materials that were within the scope of the work to be done. *Id.* at 47. Accordingly, when SDSP/WPHS paid for materials, Subcontractors would still be paid for labor under the contracts. *Id.* at 48. Bank testified the labor amount was decided based on payment application forms, which Attias, on behalf of Subcontractors, turned into SDSP. *Id.* That is, Bank testified "[Attias] allocated between material and labor, and we accepted it." *Id.*

Bank noted each trade subcontract contained a retainage provision, which was "basically an amount the lender doesn't fund pending the completion of the entire project or the entire trade." *Id.* at 49. The retainage percentage for each trade subcontract was generally 10%. *Id.* Bank noted

the contracts provided that the subcontractor had to 100% complete the contracted for work within 11 months to receive the retainage.[10]  *Id.*

Bank testified Moses Construction and Eden Plumbing began work on phase one in 2016, with the carpentry contract being the first trade subcontract on which the companies began to work.  *Id.* at 50.  Thereafter, "[t]hroughout the year basically all of th[e] trade [sub]contracts were signed, and work began for all of it."  *Id.*

Bank admitted he agreed to various changes as construction problems arose.  *Id.* at 54-55.  He noted he relied on Attias' expertise in solving the problems, and the majority of construction change orders for phase one were executed in 2016. *Id.* at 55-56.  Further, most of the work for the changes related to the orders was completed by the end of 2016. N.T., 10/14/21, at 15.  Bank testified Kodsi was not involved in the Project "at all in 2016," and either Bank or MacLean were involved with working with Attias to make necessary changes as problem arose.  N.T., 10/13/21, at 56.  He noted that, in 2016, Attias never claimed he was owed any money related to any change orders, any additional compensation for changes beyond the change orders, or that he incurred additional costs because of the change orders.  N.T., 10/14/21, at 16; N.T., 10/19/21, at 83.

_____

[10] The retainage provisions were not exactly the same for each trade subcontract.  In any event, Bank testified Attias' companies, Moses Construction and Eden Plumbing, never fully met any of the trade subcontracts.  *Id.*

Bank noted Article 9A of each trade subcontract with Subcontractors dealt with SDSP's right, as the general contractor, to "make changes to work consisting of additions, deletions, or others" without invalidating the contract. N.T., 10/13/21, at 58. Article 9A further provided a "change order…shall be the instrument required to authorize any changes to the project which shall be in writing executed by the contractor (SDSP) and any other parties[.]" *Id.* Bank confirmed that, counting the demolition, fourteen change orders were issued to Subcontractors under the trade subcontracts, and the change orders were paid.[11] *Id.* at 59. He noted the change orders caused SDSP/WPHS to expend more money.[12] *Id.* at 60.

_____

[11] Bank testified that, in accordance with the provisions in the contracts, SDSP, as the general contractor, asked Attias and his companies to furnish a cost estimate covering the work relating to the fourteen change orders. N.T., 10/14/21, at 157-60.

[12] As it relates to Subcontractors, in addition to the two change orders paid to AAA Demo for demolition work, the following change orders provided Subcontractors with an increased payment: change order one to Eden Plumbing for $31,127.24, change order two to Eden Plumbing for $31,127.24, change order three to Eden Plumbing for $38,656.39, change order four to Eden Plumbing for $101,095.95, change order five to Eden Plumbing for $66,500.00, change order six to Eden Plumbing for $97,044.00, change order seven to Moses Construction for $61,346.00, change order eight to Moses Construction for $13,729.00, change order nine to Moses Construction for $20,000.00, change order ten to Moses Construction for $1,048.00, change order eleven to Moses Construction for $120,000.00, and change order twelve to Moses Construction for $16,000.00. *Id.* at 62-82.
Bank testified regarding the reason for each change order. *Id.* He noted Attias provided the amounts for the increased payments, and it is undisputed SDSP/WPHS paid each of the amounts. *Id.* Each time, the change order was signed by Bank on behalf of SDSP and Attias on behalf of Subcontractors. *Id.*
*(Footnote Continued Next Page)*

- 11 -

Bank testified the trade subcontracts also contained Article 9J, which provided that trade contractors, such as AAA Demo, Moses Construction, and Eden Plumbing, had to make any claims for an increase in the contract sum or for an extension of time to complete work in writing to SDSP within five business days of the event giving rise to the claim. *Id.* at 61. Bank indicated that, other than the change orders discussed *supra*, Subcontractors never gave SDSP or WPHS written notice that it was performing work that it believed would increase the contract sum.[13] *Id.*

Bank testified that, for the base work, SDSP/WPHS paid Subcontractors over $6,400,000.00. *Id.* at 70. The change orders constituted additional payments for which Subcontractors were paid. *Id.* Bank reiterated no change order went unpaid by SDSP/WPHS. *Id.* at 71. Regarding design changes, he noted he rejected Attias' landscape proposal because it would increase the costs, and they "scrapped" the idea of a colace brick wall for the lobby because of costs. *Id.* at 71-72. SDSP eliminated from the original design all of the air-conditioning and heating to the corridors in the building, thus eliminating the need for approximately $325,000.00 in materials. N.T., 10/14/21, at 13.

---

Bank noted two change orders were also executed between him and Attias during the demolition phase, the change orders increased the amount to be paid to AAA Demo, and SDSP/WPHS paid the additional amounts. *Id.* at 75-77.

[13] As discussed *infra*, after Subcontractors were terminated, they submitted a series of change orders to SDSP/WPHS on July 31, 2018, for work allegedly performed outside the scope of the original trade subcontracts.

Bank testified that, throughout 2016, he was satisfied with the progress of Subcontractors; however, during the summer of 2017, he ran into conflict with Attias. N.T., 10/13/21, at 51. Specifically, Bank testified as follows:

So, in the summer of 2017, [WPHS and SDSP] ran into conflict with Moses [Construction], because based on the date that they had given us probably in February, we put into—we had hired a management company. And they told us they needed about four or five months lead time to begin leasing. And we had always made it known that we wanted to lease. It's a large project. We wanted to lease floor by floor. We didn't care which [Attias] picked, the second floor or—and he gave us some date for the delivery of the second floor. We added some time to that, and we gave the marketing management company those dates, and they commenced leasing. And as the date got closer the progress of the work seemed to get slower, and I think that it was complex. I mean, it involved a lot of finish work and everything else. But the bottom line is, the dates were looming. The work, we weren't finishing units. It was stressful. A lot of stress on the site.

*Id.* at 51-52.

Bank clarified that Attias provided Bank with the dates by which he believed construction would be done and units would be available for leasing, and based on Attias' representations, Bank contacted the marketing management company in February of 2017, to begin leasing the units on the second floor. N.T., 10/14/21, at 17. Bank noted Attias decided which floor to finish first for leasing (the second floor), and he provided a completion date of May 2017. *Id.* However, the units were not available on the dates that Attias provided to Bank. *Id.* Bank testified when it became clear Attias was not going to meet the May 2017 deadline, Attias suggested he could complete

- 13 -

the third floor for leasing by August 1, 2017; however, the units were not completed by this date. *Id.* at 19-20.

Bank testified that, with the pressure of trying to meet the leasing deadlines, Attias became "angrier and angrier" at Bank. N.T., 10/13/21, at 52. At some point, Attias would no longer talk to Bank, so all communication between Bank and Attias began to occur through MacLean, who was SDSP's employee assigned to assist Attias at the site. *Id.* Bank noted that, at a certain point, Attias told Bank he "couldn't come to the site," and, therefore, in addition to relying on MacLean for information, Bank asked Foster's husband, Kodsi, to visit the site more often so Bank could get a sense of "what was really going on." *Id.*

Bank indicated Kodsi had more experience in marketing and leasing than he had, and starting in the summer of 2017, Kodsi was at the construction site often. *Id.* at 53. Bank noted Kodsi and Attias had "a good relationship." N.T., 10/14/21, at 23. However, Bank testified Kodsi never had any ownership interest in WPHS or SDSP, and Kodsi had no authority to make any changes to the Project, direct work, approve payment applications, or obtain financing.[14] N.T., 10/13/21, at 11-13.

_____

[14] Foster also testified Kodsi had no authority to direct work or make changes at the Project, and he acted simply as a mediator when the relationship between Bank and Attias soured. N.T., 10/20/21, at 80-81. She confirmed Kodsi had no ownership interest in SDSP or WPHS. *Id.* at 92.
*(Footnote Continued Next Page)*

Bank testified that Attias' refusal to cooperate with him, speak directly to him, or answer his emails greatly impacted the Project. *Id.* at 53. He testified that, essentially, Attias was "doing whatever he decided to do" without regard to SDSP as the general contractor. *Id.* Bank testified "[t]here was a management crisis, a marketing crisis, and a completion crisis." *Id.* at 54.

Bank testified that, in response to Attias making threats that he was going to sue SDSP/WPHS and disrupt the Project, Bank, on behalf of SDSP/WPHS, agreed to pay Attias $40,000.00 a week with the payments beginning on September 18, 2017. N.T., 10/14/21, at 25-28. Bank testified

_____

Moreover, Kodsi testified he had no ownership interest in SDSP or WPHS, he never invested any money in the Project, he did not negotiate any of the trade subcontracts for the Project, and he was not involved with change orders or directing work. *Id.* at 113-15. He testified he was married to Foster, and he would visit the construction site to give Foster an update. *Id.* at 117. In the beginning of the Project, Bank and Kodsi would tour the site together, and Kodsi admitted he would make suggestions to Bank, who had the authority to reject or accept. *Id.* at 156. He indicated he expected Attias would do what Bank negotiated with him to do, and not something just because Kodsi expressed an idea. *Id.* at 160. He certainly would not expect Attias to do anything he asked him to do, and in fact, he would not ask him to do anything. *Id.* He confirmed that, in 2017, he began to visit the site more often because Attias refused to interact with Bank. *Id.* at 120. He testified that in September of 2017 he had a meeting with Attias, who threatened to leave the Project and demanded a weekly $40,000.00 payment. *Id.* at 123. Kodsi testified that, after this meeting, he went to the construction site less often, but when he went in November of 2017, Attias threatened to cause problems for the Project if he wasn't paid more money. *Id.* at 126. Attias told Kodsi he needed $200,000.00 to pay off an IRS debt, he wanted $500,000.00 to complete the work on the Project, and he wanted another $700,000.00 to walk away without suing. *Id.* at 127.

he agreed to the payments to make Attias' life less stressful so that he could be paid without submitting a payment application form.[15] *Id.* at 30. He noted it was not typical for a general contractor to agree to pay a subcontractor in such a fashion, and in the end, it cost SDSP/WPHS an extra $500,000.00 in excess of what Attias would have been owed for the work. *Id.*

Bank testified he later learned Attias was making verbal claims he was owed compensation for additional work that he had performed, and in response, Bank "was shocked." *Id.* at 31. Bank noted Attias did not provide him with a written list of additional work for which he believed he should be compensated. *Id.* Bank requested that Kodsi and MacLean discuss the situation with Attias to come to an understanding about Attias' claim. *Id.*

Bank testified that, as the fall of 2017 progressed, and despite SDSP/WPHS making weekly $40,000.00 payments to Attias, Attias made additional threats of commencing litigation to get additional compensation. *Id.* at 35. Attias also submitted payment applications to SDSP/WPHS, and the payment applications were paid from the $40,000.00 weekly payment being made to Attias. *Id.* at 39-41. Bank noted that, each time the payment applications were submitted, Attias signed a lien waiver, which was necessary

---

[15] On cross-examination, Bank clarified the $40,000.00 weekly payment to Attias did not eliminate the monthly payment application process. N.T., 10/19/21, at 22. Thus, Attias continued to submit payment applications for completed work, and the applications were submitted by Bank to MidFirst Bank so that construction funds could be released. *Id.* at 23.

- 16 -

for SDSP/WPHS to continue making the $40,000.00 weekly payments. *Id.* at 41-42. Bank testified that, in reality, SDSP/WPHS made payments to Attias surpassing the payment applications submitted by Attias. *Id.* at 39.

Bank testified that, in November of 2017, he received a temporary certificate of occupancy for units 201 to 226, as well as units 228 to 235. *Id.* at 44. He noted these units are on the second floor of the building; however, the units do not comprise the entirety of the second floor, which Attias indicated would be completed in May of 2017. *Id.* Bank testified the temporary certificates did not mean the units were ready to be occupied, and in fact, the units still needed to be painted, have bathroom fixtures installed, and have the flooring completed. *Id.* at 46. Bank testified the finish work was not completed for the third-floor units as of November 16, 2017. He noted a temporary certificate of occupancy was issued for several units on the fourth floor on December 5, 2017; however, these units did not have finish work completed. *Id.* at 48.

Bank testified that, as of December 2017, Attias continued to threaten to sue SDSP/WPHS for additional compensation; however, Attias never provided a written list of work corresponding to his demands. *Id.* at 49. Bank also testified that, as of the end of December 2017 and beginning of January 2018, Attias stopped appearing at the Project site, and his workers were not being effectively managed. *Id.* at 76. Near the end of January 2018, Subcontractors stopped working on the Project. *Id.*

Accordingly, on February 4, 2018, Bank sent an email to Attias advising him that SDSP/WPHS had paid Subcontractors approximately $6.2 million, which was approximately $360,000.00 more than what they were entitled to be paid according to the trade subcontracts as amended by the change orders. *Id.* at 78-79. That is, Attias was paid "more than he had earned." *Id.* at 78.

Attias did not respond directly to Bank regarding the email; however, on February 5, 2018, Attias sent a letter to the Regional Director of MidFirst Bank indicating Subcontractors were leaving the Project because they were not paid the retainage fees,[16] not compensated for additional completed work, and not given payment for their vendors. *Id.* at 80-83.

Bank testified Attias informed MacLean on February 8, 2018, that Subcontractors would return to the Project if paid $130,000.00; however, he would not initially sign lien waivers. *Id.* at 84. After Attias signed the lien waivers, Bank wired $130,000.00 to Attias, and Subcontractors resumed work on the Project. *Id.* at 85-86. However, on March 2, 2018, Subcontractors stopped work again at the Project. *Id.* In response, Bank sent Attias a Notice to Cure in early March of 2018; however, Subcontractors never returned to

---

[16] Bank testified Moses Construction and Eden Plumbing were not paid the retainage fees because none of the work was completed in accordance with the trade subcontracts. N.T., 10/13/21, at 80-81. He noted Attias did not make any request for SDSP/WPHS to extend the contract retention period. N.T., 10/19/21, at 85. However, he noted Attias' company, AAA Demo, was paid the retainage fee because the work was completed in accordance with the contract. N.T., 10/14/21, at 138.

work at the Project. *Id.* at 87-88. As a result, SDSP formally terminated Subcontractors on March 14, 2018, and Bank secured new subcontractors to finish the Project. *Id.* at 88-89.

As of the date of termination, Attias had received $6,381,992.40 from SDSP/WPHS in connection with the Project. *Id.* at 89. Bank testified SDSP/WPHS had purchased the necessary materials for the Project, and it had cost $2.5 million for these materials.[17] *Id.* Bank noted that, after Subcontractors' termination, Attias returned to the site, and without authorization, he took 2000 kitchen cabinets having a value of $75,000.00. *Id.* at 112. SDSP/WPHS owned the cabinets. *Id.* On November 16, 2018, Bank secured a Certificate of Occupancy for all of the apartment units in phase one. *Id.* at 111.

On cross-examination, Bank admitted that, during phase one of the Project, Kodsi provided advisory services to him and Foster. *Id.* at 124. He also admitted that, in 2017, when problems arose between Bank and Attias, Kodsi stepped in to negotiate. *Id.* Bank clarified that Kodsi acted as an intermediary between Bank and Attias with Bank and Foster having final authority to approve or disprove suggestions. *Id.* at 125. Bank admitted that

---

[17] On cross-examination, Bank testified that, to the best of his knowledge, SDSP purchased all of the materials relating to Subcontractors' scope of work. N.T., 10/19/21, at 17. He further testified on cross-examination that, after he testified on direct examination, he examined the relevant documentation, and SDSP/WPHS had actually spent $3.3 million or $3.4 million on these materials. *Id.* at 18.

Kodsi sent "e-mails directly to the various people involved with the phase one construction to direct them to do work[;]" however, Bank testified "I would not say he was authorized to do that." *Id.* Bank admitted he did not tell Attias that Kodsi was not authorized to speak on behalf of WPHS or SDSP. *Id.*

Bank admitted that SDSP employee, MacLean, was on the construction site daily from 2016 until the end of December of 2017, and he provided Bank and Foster with updates regarding the Project. *Id.* at 133. MacLean maintained an office at the construction site, and he was authorized to "collect invoices that would be submitted as part of SDSP payment applications to MidFirst Bank[.]" *Id.* at 134. Bank noted MacLean had no experience in construction prior to the instant project, and while he occasionally produced project schedules, it was not part of his normal job duties. *Id.* Rather, project schedules were created with a software program, Microsoft Project, and excel sheets. *Id.* at 135.

Bank admitted that some of the trade subcontracts SDSP had with Moses Construction and Eden Plumbing contained no dates, no attached project schedules, and cover pages inconsistent with the scope of work.[18]

_____

[18] Bank testified that, although some of the trade subcontracts did not have all information filled in or contained cover pages inconsistent with the body of the contracts, Attias reviewed the contracts, accepted the contracts, performed work under the contracts, and was paid in accordance with work done under the contracts. N.T., 10/19/21, at 77-80. Attias raised no objections to the trade subcontracts. *Id.* at 81. Further, although the project schedule was not attached to each trade subcontract, Bank testified he gave
*(Footnote Continued Next Page)*

However, Bank indicated he discussed with Attias that, under the trade subcontracts, the scope of work included "everything on the documents and all of the things that [they] had discussed were part of the Project, including the 2015 [Architect's drawings]." *Id.* at 152. Bank clarified the 2015 drawings contained some detail, but not all of the detail required for work completion. *Id.*

Bank admitted that SDSP/WPHS received from MidFirst Bank all of the retainage that was left under all of the trade subcontracts, including those relating to Moses Construction and Eden Plumbing; however, SDSP/WPHS did not pass along the retainage to Moses Construction, Eden Plumbing, or Attias. N.T., 10/15/21, at 145. Bank testified SDSP did not submit as part of its final application to MidFirst Bank any of Moses Construction's or Eden Plumbing's requests for release of retainage fees since they were no longer employed by SDSP/WPHS, they had not completed the work, SDSP was out of pocket for materials, and other subcontractors had to complete work after Subcontractors were terminated. *Id.* at 146. Bank noted the Notice of Termination was sent to Subcontractors after they stopped working for a second time in less than thirty days. *Id.* at 147. Bank testified the trade

_____

Attias a copy of the project schedule, as well as all revisions. *Id.* at 85-86. Bank testified the project schedule revisions were necessary because "Attias was not meeting the schedules, so the schedules had to be revised to reflect the pace of construction." *Id.* at 86.

subcontracts for Subcontractors were terminated because they failed to "supply sufficient skilled workmen, failed to timely complete the work, and failed to prosecute its work." *Id.* at 152.

Bank explained that, prior to termination, a Notice of Cure was sent to Attias to give him an opportunity to reach out, commence a plan as to how to proceed forward, and come back to work. *Id.* at 155.

Bank acknowledged that, after the Notice of Cure was sent to Attias, and before the formal termination, Attias sent a letter to SDSP on March 9, 2018, asking for specificity as to why Subcontractors were allegedly in default. *Id.* at 159. Bank explained SDSP/WPHS did not respond because "the fact [Subcontractors] were not working was sufficient for them to understand what the problem was." *Id.* Bank testified SDSP/WPHS filed the instant lawsuit against Subcontractors seeking compensation for the cost of completing or

repairing defective work,[19] which Subcontractors were obligated to perform within the scope of the trade subcontracts.[20] *Id.* at 164.

Scott Geddes ("Geddes") testified he began working for SDSP at the construction site of the Project in the fall of 2017, and Subcontractors' work progress was "sporadic," particularly after January 1, 2018. *Id.* at 151. He noted Subcontractors stopped work at least twice in early 2018, and after January 1, 2018, Attias stopped coming to the job site personally, thus resulting in his workers "slacking off." *Id.* at 151-53. He noticed fewer and fewer workers at the job site as January and February of 2018 progressed. *Id.* at 157.

_____

[19] Bank testified extensively about work allegedly uncompleted by Subcontractors as of March 2, 2018. N.T., 10/19/21, at 94-125. He testified all of the work was within the scope of work of Subcontractors' trade subcontracts for phase one, and the work had to be completed by other contractors after Subcontractors walked off the job. *Id.* at 94-126. As discussed *infra*, the trial court found in favor of Subcontractors and against SDSP/WPHS on SDSP/WPHS's claim of breach of contract for alleged unfinished work. SDSP/WPHS has raised no specific claim regarding this portion of the trial court's order.

[20] Bank testified Subcontractors were fully paid for all of the work they completed, and, in fact, they were paid in advance for work; however, he noted Subcontractors did not fully complete the work under the trade subcontracts. N.T., 10/19/21, at 87. He noted that, after Subcontractors stopped working on the Project, Bank compared the amounts paid to Subcontractors against the payment applications submitted by Attias. *Id.* at 89. He discovered SDSP/WPHS paid Attias $360,000.00 more than he was owed for the work he had done. *Id.*

Geddes testified that, although SDSP/WPHS received temporary certificates of occupancy in late 2017, the apartments were not habitable.[21] *Id.* at 154. He told Attias in December of 2017 that people were complaining because apartments were incomplete or insufficient for move in. *Id.* at 155-56. Geddes testified that, in early March of 2018, Subcontractors left the Project and did not return. *Id.* at 158. Geddes estimated the work for phase one, which comprised four floors of one wing of the building, was "about 85 percent complete" at this time. *Id.* He noted that not a single apartment unit in phase one was complete. *Id.* at 159. He testified the lobby was complete; however, the gymnasium and laundry room were not complete. *Id.* He also testified contractors discovered defective work after Subcontractors stopped working, including improperly installed HVAC units. *Id.* at 162-63.

Geddes testified he was hired to work as a project manager on phase two of the Project; however, phase two had to be put on hold because phase one had to be put "back on track." *Id.* at 160. Geddes noted a property management company and other subcontractors were hired to help finish the units in phase one, which included drywalling, painting, laying bricks, and tiling. *Id.* He testified it took approximately six months to complete and/or repair the work after Subcontractors left. *Id.* at 161. He testified he observed

---

[21] The certificates of occupancy were necessary for WPHS to meet its obligation to the tax investor. N.T., 10/20/21, at 165-66.

Attias and his workers remove kitchen cabinets from the Project in March of 2018, and SDSP/WPHS had to purchase new cabinets. *Id.* at 168-69.

Attias testified he bid $500,00.00 to do the demolition work for phase one of the Project; however, his bid was rejected, and the job was granted to a different company. N.T., 10/21/21, at 25-28. However, in the spring of 2015, Bank informed Attias that he needed a new demolition company, so Attias agreed to complete the demolition work for phase one for $500,000.00 minus $30,000.00 to account for work completed by the first company. *Id.* at 28.

Attias testified he began the demolition for phase one in October of 2015, and he finished approximately six months later. *Id.* at 34. He admitted there were two demolition change orders, which totaled $55,556.00. *Id.* at 35. He testified that, after he left the Project, he realized he completed significant demolition outside the scope of the original trade subcontract. *Id.* at 37. Thus, on July 31, 2018, he submitted a change order to Bank for the demolition work; however, the change order was not paid by SDSP/WPHS. *Id.* at 36, 43.

Attias testified that, during the demolition, Kodsi told him that any changes to the scope of the demolition that needed to be made should be done by Attias, and he would be paid the extra amounts. *Id.* at 36. He noted the actual demolition completed during phase one, as depicted in the Architect's final revised drawing of March 13, 2018, substantially differed from

the original 2015 drawing of the scope of the demolition work. *Id.* at 37-39. In this regard, he noted that, in the original 2015 drawing, shafts[22] remained in every classroom; however, as indicated in the final 2018 drawing, AAA Demo demolished the entre shaft between the second, third, and fourth floors. *Id.* at 43.

Attias testified Kodsi was his contact person for the trade subcontracts for Moses Construction and Eden Plumbing, Attias began work under these trade subcontracts in 2016, and Kodsi directed his work. *Id.* Based on how Kodsi was presented to him during the meetings, Attias believed Kodsi and Bank were co-owners of SDSP/WPHS. *Id.* at 71. Attias testified he trusted Kodsi and did what Kodsi told him to do. *Id.* at 60.

Attias indicated that a deadline for phase one was not mentioned at any time during the 2016 meetings, project schedules were not attached to trade subcontracts, and trade subcontracts were not dated. *Id.* at 51-155; N.T, 10/22/21, at 136. Attias denied he ever verbally or in writing agreed to have second floor apartment units finished by May of 2017. N.T., 10/21,21, at 66. He noted Bank and Kodsi started pushing for Attias to complete work during the spring of 2017 because a nearby building had "evicted everyone," and Bank wanted to take advantage so that people would move into the West Lofts. *Id.* Attias indicated the first time Kodsi (or anyone) mentioned a project

---

[22] Shafts are used to run ductwork and piping. *Id.* at 43. By removing the shafts, the size of the apartment units increased. *Id.*

deadline was in October of 2017, when Kodsi informed him the work for phase one needed to be completed by December 31, 2017, so that WPHS could get a tax credit for the historical building. *Id.* at 65. He testified his companies worked "day and night" to get it complete, and SDSP/WPHS received a final temporary certificate of occupancy on December 29, 2017. *Id.*; N.T., 10/26/21, at 5. Attias testified that WPHS received its tax credit. *Id.*

He noted that, when he signed the trade subcontracts, it was his understanding, as indicated in the 2015 drawings,[23] that the scope of work for phase one was 131 apartment units. *Id.* at 53. He also noted the scope of work for each trade subcontract was based on the 2015 drawings. *Id.* It was his understanding that the amount of payment in each trade subcontract would correspond to the amount of labor and materials required for each trade as set forth in the 2015 drawings. *Id.* at 57.

He noted Bank informed Attias of the budget for the trade subcontracts and provided the itemized amounts for the materials.[24] *Id.* at 126. However, many times, if the amount for materials for a specific trade ran over budget,

---

[23] Attias indicated the 2015 drawings included the 2015 drawings from the Architect, as well as electrical drawings dated May 11, 2015, and plumbing drawings dated August 11, 2015, from BHG Consulting. *Id.* at 63-64. Attias testified that, together, these drawings constituted the scope of work that his companies were to complete for phase one construction. *Id.* at 64.

[24] Attias indicated sometimes SDSP paid for materials; however, sometimes Attias paid for materials necessary to perform under the trade subcontracts. *Id.* at 83.

Bank told Attias he was adding the extra amount to a contract for a different trade.[25] *Id.* at 61. Attias never reviewed any trade subcontracts with Bank; but rather, he was given the signature page only for each trade subcontract, and he would verbally review the basic scope of work for each subcontract with MacLean.[26] *Id.* at 56. He testified he was not given the full trade subcontracts until December of 2017. *Id.*

Attias acknowledged he was required to submit payment applications, which reflected the amount of work Subcontractors had completed during a specific period, in order to be paid. *Id.* at 59. He submitted payment applications throughout Subcontractors' work on phase one. He specifically noted he submitted payment applications on February 7, 2018, and March 1, 2018, for carpentry work; February 9, 2018, and March 2, 2018, for concrete and masonry work; February 9, 2018, for HVAC work; February 9, 2018, and March 1, 2018, for painting and plastering work; March 1, 2018, for plumbing

---

[25] For example, Attias testified the trade subcontract for tile was only $60,000.00, and the scope of work was based on the 2015 drawings, which required Attias to tile only the floor of bathrooms and the backsplash of kitchens. *Id.* at 153. However, the budget went over because Bank asked Attias to tile around the tubs in bathrooms, trash room floors, and laundry room floors. *Id.* When the budget went over for tile, Bank put an extra $100,000.00 on the steel trade subcontract to cover the "extra" expense related to the tiling costs. *Id.* at 62.

[26] Attias indicated MacLean was originally an employee of SDSP, but he became an employee of Moses Construction on December 31, 2017. *Id.* at 72.

work; February 7, 2018, and March 1, 2018, for roofing work; March 1, 2018, for contract sitework; February 7, 2018, for structural steel work; February 7, 2018, and March 1, 2018, for tile work, and two payment applications for flooring work. *Id.* at 118-50; N.T., 10/22/21, at 130-31. However, despite the fact Bank prepared these payment applications because MacLean was now working for Moses Construction, the payment applications were not paid by SDSP/WPHS. *Id.*; N.T., 10/26/21, at 83-84. He indicated these payment applications were for the remaining balance owed under the original scope of the trade subcontracts as to labor, as well as retainage fees.[27] *Id.* at 77-79, 86-87.

Attias testified that, since he was owed money due to design changes, he discussed payment with Bank and Kodsi many times. N.T., 10/22/21, at 170; N.T., 10/26/21, at 6-7. During a meeting in August or September of 2017, Kodsi asked MacLean to create a list of Attias' "extra out-of-scope" labor and materials. N.T., 10/22/21, at 170. Kodsi told Attias that Attias would be paid for the additional out-of-scope work when phase one was complete and SDSP/WPHS received financing for phase two. *Id.*

Attias indicated Kodsi agreed during the meeting that SDSP/WPHS would begin paying Attias $40,000.00 weekly to put towards the base in-scope

---

[27] Attias noted he submitted the information to Bank prior to his termination with regard to the February and March 2018 payment applications; however, Bank did not submit them to Midfirst Bank until after Attias was terminated. N.T., 10/26/21, at 85.

labor and materials, and the change orders would be addressed at the conclusion of phase one.   N.T, 10/25/21, at 19-95.   Attias testified the $40,000.00 payment was subtracted from his payment applications, so he was not paid in excess of his payment applications for his work. ***Id.*** at 19.

Attias testified Bank knew of the meetings and agreements.   N.T., 10/22/21, at 171.   Further, Attias testified that, although SDSP/WPHS purchased materials for phase one, he purchased thousands of dollars of materials, including kitchen cabinets. ***Id.*** at 196-98. He testified he took kitchen cabinets after he was terminated because he had purchased the cabinets, which were extra materials, so he took his extra material. ***Id.*** at 200.

Attias testified he told Kodsi in the fall of 2017 that when phase one was complete he was not continuing with the Project because he was not being paid in a timely fashion. N.T., 10/26/21, at 7.  He testified that, many times prior to his termination, he told Kodsi and Bank that he had "a big list of change orders," which needed to be paid. ***Id.*** at 7, 31.  He testified he was told he would be paid for the changes after the completion of phase one, and thus, after his termination, he submitted the change orders in writing on July 31, 2018. ***Id.***

Attias denied he or his workers ever "walked off the job." ***Id.*** at 8.  He testified he was personally at the construction site every day from when the temporary certificate of occupancy was issued on December 29, 2017, until

Subcontractors were terminated on March 14, 2018. *Id.* at 11.  He noted his employee payroll logs revealed forty-two of his workers were on the construction site throughout November 2017 to March 11, 2018. *Id.* at 23.

Attias testified Subcontractors completed all tasks on Bank's July 4, 2017, "punch list for move-ins," and after December 29, 2017, Bank gave him another "punch list for move-ins" on which Subcontractors were working until they were terminated by Bank.  *Id.* at 12.  Attias intended to complete all the tasks; however, his termination prevented him from doing so. *Id.* at 17.

He testified that, on February 5, 2018, he sent an email to MidFirst Bank because he was working without getting full payment. *Id.* at 27. Also, he sent an email to MidFirst Bank on March 2, 2018, explaining that payment was still owed, and if Subcontractors were paid, they would complete the December 29, 2017, "punch list." *Id.* at 28. He noted that, even after he sent the emails to MidFirst Bank, he and his workers continued working at the Project's site. *Id.* at 29. He noted that when he received the March 7, 2018, Notice to Cure, he and his workers were at the Project site working. *Id.*  Thereafter, he received the termination notice on March 14, 2018, and he did not return to work at the Project.  *Id.* at 30.  He noted that, after termination, he was not permitted to return to inspect any work, which SDSP/WPHS claimed was defective or incomplete. *Id.*

Attias testified that, after Subcontractors were terminated from the Project, and since he was still owed payment for labor and materials related

to extra work performed outside of the scope of the trade subcontracts, he submitted eleven change orders[28] on July 31, 2018. Attias testified the total for the July 31, 2018, change orders, which encompassed work performed by Subcontractors outside of the scope of the original trade subcontracts, was approximately $3 million. N.T., 10/26/21, at 34. Additionally, he testified that, as of the date of Subcontractors' termination, based on unpaid payment applications, and including the $40,000.00 payments, he is owed approximately $600,000.00 for unpaid base work included within the scope of Subcontractors' trade subcontracts. *Id.* at 33.

Attias also testified he is entitled to $540,000.00 in retainage fees. *Id.* Attias testified he was never informed that Subcontractors would lose the retainage fees if work for each trade subcontract was not completed within eleven months of a specified start date. *Id.* at 75. He noted he signed lien waivers and still did not receive the retainage fees. *Id.* at 33.

Regarding alleged defects in Subcontractors' work, Attias admitted that Eden Plumbing installed HVAC units, and there was a problem with receiving approval regarding the fire code. *Id.* at 92. However, he testified his company

---

[28] The July 31, 2018, change orders included one for the following trade subcontracts: demolition, carpentry, concrete and masonry, flooring, HVAC, plaster and painting, plumbing, roofing, sitework, tiling, and windows. N.T., 10/26/21, at 32.

did not make a mistake; but rather, he followed the express direction of Bank as to the location for installing the HVAC units. *Id.*

Regarding the construction of a retaining wall, Attias testified this term was added to the scope of the work on the original trade subcontract without his signature or knowledge. *Id.* at 140. He explained that during construction an inspector informed Bank that a retaining wall needed to be fixed, so Bank hired an engineer, who informed Attias as to how the wall should be fixed. *Id.* at 141. Attias then fixed the wall, all of which occurred well after the trade subcontracts were executed. *Id.*

On January 12, 2017, Attias submitted a payment application, which did not include payment for the retaining wall. *Id.* at 144. Attias indicated that, thereafter, Bank made a notation to make it look like the payment application included payment for the retaining wall. *Id.* Attias additionally testified that, well beyond the scope of the trade subcontract, as indicated by the 2015 drawings, he removed old walls and created new walls. *Id.* at 141.

On cross-examination, when confronted with a February 19, 2016, email Bank sent to Attias, which contained eleven attached trade subcontracts, Attias admitted he received the email. *Id.* at 58-60. He admitted he briefly reviewed the trade subcontracts before he signed them. *Id.* at 64-66. He admitted the total for all eleven trade subcontracts is about $7.7 million. *Id.* at 66. That is, under the eleven trade subcontracts, Attias and his companies would receive $7.7 million for labor and materials (if Attias supplied all

materials) for completion of the original scope of work without any change orders. *Id.* at 66-67.  Attias admitted he did not supply all of the materials for the Project under the original scope of the trade subcontracts. *Id.* at 68.  Attias testified the cost of materials he purchased for phase one was "a few hundred thousand dollars" total. *Id.* He contended he was reimbursed for "a small portion" of the materials he purchased. *Id.* at 71.

Attias testified he was paid a total of $6,321,702.93 by SDSP/WPHS for work performed under the trade subcontracts. *Id.* at 75-76. He testified the amount does not cover his in-the-scope of contract labor costs, which he sought payment for in his payment applications. *Id.* at 75. He noted he was not seeking reimbursement for materials he purchased for the original scope of the trade subcontracts. *Id.* at 79. Attias testified the amount he is owed for original base in-scope labor under the trade subcontracts, including retainage fees, is approximately $1.1 million. *Id.* at 77.

Attias admitted that SDSP/WPHS paid all payment applications submitted by Attias prior to January 1, 2018; however, he noted the payment applications he submitted in February and March of 2018, for base in-the-scope labor were not paid by SDSP/WPHS.[29] *Id.* at 77-79.  He testified these

---

[29] Attias clarified his payment applications did not include the cost of materials he expended for the in-the-scope work, but as indicated *supra*, he was not seeking reimbursement for the materials. *Id.* at 79.

payment applications sought payment for the retainage fees and remaining balances owed under the original scope of the trade subcontracts. *Id.* at 66.

As to the July 31, 2018, change orders, Attias testified he is seeking payment for materials related to "additional work" beyond the scope of the trade subcontracts. *Id.* at 79.

Regarding a schedule, Attias testified "we never had a schedule." *Id.* at 88. When confronted with an email Bank sent to him on June 9, 2016, which indicated the start date for phase one is "2/29/16" with a finish date of "2/24/17," Attias testified the print was so small he could not read it. *Id.* at 91-92.

Regarding the March 2, 2018, letter, which Attias sent to MidFirst Bank, he indicated he was seeking payment for the February and March 2018, payment applications, and all of the additional work, which was reflected in the subsequent July 31, 2018, change orders. *Id.* at 108. He admitted he did not provide MidFirst Bank with an itemized list of additional work until July 31, 2018. *Id.*

As to what consisted of a change in the scope of work for purposes of the July 31, 2018, change orders, Attias indicated he compared the 2015 drawings to final drawings; however, he admitted the trade subcontracts referred to other exhibits prepared specifically for the contracts as to the scope of work. *Id.* at 116-33. Attias denied he was obligated to perform work "reasonably inferable from" the attached exhibits. *Id.* at 123-33. Attias

indicated that, each time a change was made that would cost him additional labor, he made a note; however, he admitted he did not have the notes to enter into evidence. *Id.* at 135. Attias admitted that, prior to the July 31, 2018, change orders, he never provided Bank with a written list of changes. *Id.* at 136.

Attias testified that, during a meeting in August or September of 2017, Kodsi told him that he would be paid for any additional labor or materials outside the original scope of work after phase one was finished. *Id.* at 136-37. Attias testified he created a list of changes during this meeting, but he didn't keep a copy of the list. *Id.* at 139.

He acknowledged that his employee payroll records reflected he paid a total of $1,318,989.19 to his employees who worked at the Project. *Id.* at 142-43. He also acknowledged his records reflected he paid a total of $490,650.00 to New Touch Plumbing, which is a company Attias brought in as a subcontractor to assist Eden Plumbing during phase one. *Id.* at 154. Further, he acknowledged his records, as prepared by MacLean, reflected receipts totaling $71,195.42 to Home Depot for materials for phase one. *Id.* at 152.

Regarding the July 31, 2018, change orders, Attias admitted he "estimated" the additional labor and materials for each trade's change order, and he had no records to support his estimations. N.T., 10/27/21, at 7-36. Regarding the demolition, he explained his estimation was based on the demolition of items not shown on the demolition drawings attached to the

demolition trade subcontract. *Id.* However, Attias admitted his July 31, 2018, change order for demolition included the demolition of lobby walls, but lobby walls were marked in the August 26, 2015, drawings for demolition. *Id.* at 26-28.

Also, Attias indicated his change order for HVAC was based on the unexpected purchase of eight additional HVAC units; however, Attias was confronted with a 2016 drawing that reflected the existence of the eight HVAC units as being part of the original scope of work. *Id.* at 29. Further, he indicated the original contract provided for plumbing for 131 apartment units, so his July 31, 2018, change order included plumbing for additional seven units, which were built. *Id.* at 31. However, he was confronted on cross-examination with an exhibit attached to the original 2016 plumbing subcontract indicating plumbing was for 138 apartment units. *Id.* at 32.

Attias indicated his change order for tiling included the tiling of bathroom walls, and his change order for sitework included outside landscaping; however, on cross-examination, he was confronted with the original trade subcontracts and exhibits, which provided the scope of the original work as including "installation of apartment bathroom wall tile" and "work description mass landscaping." *Id.* at 43-47. The same documents referenced the

repairing of retaining walls as within the scope of the trade subcontracts.[30] *Id.* at 47. Regarding the roofing change order, Attias admitted he had no records or receipts as to the alleged "extra" materials. *Id.*

Regarding the removal of kitchen cabinets, Attias indicated he purchased 2000 kitchen cabinets for the Project. He testified that, when he left the Project, he took kitchen cabinets that he had been storing at the site. *Id.* at 52.

MacLean testified he was initially an intern at Heights Advisors, and it was his understanding that Bank, Foster, and Kodsi were involved in running Heights Advisors, WPHS, and SDSP.[31] N.T., 10/22/21, at 9. Based on Kodsi's involvement and requests for updates, he specifically believed Kodsi was a part owner of the Project. *Id.* at 14.

In January of 2016, MacLean was hired as the project manager for SDSP, and he worked at the construction site on a daily basis until he left SDSP's employment at the end of December 2017, at which time he became

---

[30] Attias' July 31, 2018, change order for sitework included a request for $10,125.00 for the repair of a retaining wall. *Id.*

[31] MacLean testified he is currently a full-time student in California. As of the time he began working for SDSP, he had no experience in running a construction site, preparing project schedules, coordinating subcontractors' work, or construction project administration. N.T., 10/22/21, at 6-7.

employed by Moses Construction.[32] *Id.* Prior to MacLean leaving SDSP's employment, he gave weekly email updates to Bank, Kodsi, and Foster. *Id.* at 13. Kodsi made changes to the Project, including changes to bathroom locations. *Id.* at 15. MacLean testified that "[Kodsi] would walk through and every time there would be some design change or some revision." *Id.* Neither Bank nor Foster told MacLean that Kodsi was not authorized to make changes. *Id.*

MacLean testified Bank drafted the trade subcontracts. *Id.* at 16. On some occasions, MacLean only gave Attias the signature page to sign without the corresponding body of the contract; however, when MacLean left SDSP's employment, MacLean printed out the full trade subcontracts and gave them to Attias. *Id.* MacLean testified that, to his knowledge, there was no project completion deadline for the work performed by Subcontractors. *Id.* He had no knowledge of a project schedule that he was supposed to be enforcing for SDSP. *Id.*

MacLean was responsible for preparing project schedules, which involved a team of people collaboratively deciding the number of days it should take for Subcontractors to complete specific tasks. *Id.* However, the project schedules were collaboratively extended many times during the Project. *Id.*

---

[32] MacLean testified that, after he became employed by Moses Construction at the end of 2017, he was no longer at the construction site; however, he communicated with Bank a few times via email in 2018 on behalf of Attias when payment applications were not being paid by SDSP/WPHS. *Id.* at 66.

MacLean is aware of no time that anyone told any subcontractor that he or she was beyond a completion deadline or that the subcontractor was in default for failing to meet a deadline. *Id.* at 20.

MacLean testified that, after construction of phase one began, Bank added eight apartment units, and Subcontractors were directed to build the eight new apartments. *Id.* at 28. MacLean indicated he directed no changes on the Project without Bank or Kodsi first giving approval. *Id.* MacLean testified it was his understanding that Attias was going to be paid at the end of phase one for any additional costs of labor and materials, which were in excess of the trade subcontracts and/or for changes. *Id.* at 29.

MacLean acknowledged he prepared payment applications for Attias during 2016 and 2017;[33] however, Bank prepared the applications in 2018 after MacLean left SDSP's employment. *Id.* at 31. The payment applications included labor, as well as materials purchased by Attias. *Id.* MacLean noted a ten percent retainage was held on each trade subcontract as to labor and

---

[33] MacLean testified that, before the payment applications were submitted to MidFirst Bank for payment, the work corresponding thereto was inspected by the Architect. *Id.* at 128. Also, before Midfirst Bank paid out on the payment applications, Midfirst Bank sent an engineer to inspect the work. *Id.* Thus, Attias was not paid on any payment applications until at least two inspectors examined it. *Id.*

materials purchased by Attias.[34] *Id.* at 38-39. "The total retainage held was $554,065.49[.]" *Id.* at 117.

MacLean testified the total payment applications billed by Moses Construction, Eden Plumbing, and AAA Demo was $7,075,495.00, which included labor and materials purchased by Attias for the base contract work, as well as the change orders.[35] *Id.* at 47. However, the total amount paid by SDSP/WPHS was $5,961,702.00. *Id.* MacLean clarified that he included the $40,000.00 weekly payment in the total amount paid to Attias. *Id.* at 48. He also included some additional payments made in January and February of 2018, including a lump sum payment of $150,000.00, which SDSP/WPHS made to Attias. *Id.* at 49. Thus, MacLean testified the total amount not paid to Subcontractors on the payment applications was $1,113,792.00, which includes base contract work, as well as retainage fees of $544,229.00, which were requested by Attias. *Id.* at 53.

---

[34] A retainage percent was not held for any of the materials purchased directly by SDSP/WPHS. *Id.* at 117.

[35] MacLean testified AAA Demo completed demolition during phase two for which a payment application was not completed, but it was billed to SDSP/WPHS on a single-sheet invoice. *Id.* at 40. MacLean testified that the total amount of payment applications billed by Moses Construction, Eden Plumbing, and AAA Demo was $7,435,495.00, which included phase two demo work totaling $360,000.00. *Id.* at 50. MacLean testified the phase two demo work ($360,000.00) should not have been included in the net payment application amount since it was not billed via a payment application. *Id.* at 46.

MacLean confirmed that on July 31, 2018, he assisted Attias in preparing change orders for work allegedly completed beyond the scope of the original trade subcontracts for which Subcontractors were not paid by SDSP/WPHS. *Id.* at 55. He concluded a change occurred by comparing the work as originally set forth in the 2015 drawings with the "as built" revised drawings. *Id.* MacLean testified he assisted Attias in submitting the change orders on July 31, 2018, because it was his understanding from discussions with Bank and Kodsi that Attias would be paid for changes at the end of the Project. *Id.* at 59. To his knowledge, SDSP/WPHS did not pay Attias with regard to the July 31, 2018, change orders. *Id.*

On cross-examination, MacLean acknowledged that, when he was working at the construction site on behalf of SDSP in 2017, Attias verbally complained that he was owed money for the labor costs/material reflected in the July 31, 2018, change orders; however, "Attias did not submit any of the requests for payment for the July 2018 change orders while he was working on the Project[.]" *Id.* at 76. MacLean confirmed he never saw a written agreement indicating Attias would be paid for the additional work or materials after phase one. *Id.*

MacLean confirmed that, in the fall of 2017, Kodsi informed him Attias was going to be receiving a weekly $40,000.00 payment from SDSP/WPHS. *Id.* at 84-85. However, the agreement for this payment between Attias and SDSP/WPHS was verbal. *Id.* MacLean confirmed that both Bank and Kodsi

- 42 -

directed changes be made during the Project. *Id.* at 90-91. MacLean admitted Attias made some changes himself to make feasible the design wishes of Bank and Kodsi. *Id.* at 91-92.

MacLean confirmed that in February of 2018 Bank asked Attias to execute a series of lien waivers in exchange for receiving approximately $130,000.00, and Attias executed the lien waivers. *Id.* at 95-99. MacLean confirmed that, as of the date of the lien waivers, Attias had not been paid for the work and material as reflected in the July 31, 2018, change orders, which Attias submitted to SDSP/WPHS.[36] *Id.* at 97-99. MacLean confirmed that, after Subcontractors left the Project in March of 2018, Attias did not receive any additional payments. *Id.* at 106-07.

Craig Deutsch ("Deutsch"), a representative of Architect, testified architectural drawings lay out generally the work that is proposed to be done for a project, but the drawings do not show every detail of the project. N.T., 10/25/21, at 13, 65. He noted the September 29, 2015, drawings provided for 131 total apartment units for phase one. *Id.* at 15. He testified the drawings set forth measurements as to how the units were intended to be constructed as of September 29, 2015, as well as a general finish schedule. *Id.* at 22.

---

[36] Subsequently, SDSP/WPHS refused to pay the July 31, 2018, change orders. *Id.* at 129.

Deutsch acknowledged that, after work began on phase one of the Project, he received requests for design changes from Bank, and he sketched out changes for him. *Id.* at 26-27. He confirmed most of the apartment units had changes made from the original September 29, 2015, drawings, and these changes were directed by Bank. *Id.* at 36, 39, 42. He indicated the changes did not necessarily entail additional work, not all of the changes were significant, and in some cases the changes could have eliminated work. *Id.* at 76-77.

Joseph McFadden ("McFadden"), who was offered by Attias as an expert in evaluating construction damages and costs, testified he examined the trade subcontracts, as well as the drawings from 2015 to 2018, to determine the "basic design from 2015 and how it changed over the course of the construction." N.T., 11/1/21, at 19. He testified he looked at the "as-built drawings" and tried to estimate the man-hours and materials "that could have been used to build what is reflected on those as-built drawings." *Id.* at 20. He then assigned a value for the "as-built" drawings and looked for changes from the original drawings. *Id.* He testified to a reasonable degree of professional certainty, that, based on his evaluations, there were "21 change events."[37] N.T., 10/27/21, at 181.

_____

[37] McFadden testified about the items he viewed as "change events." *See* N.T., 10/28/21, at 4-127. He noted the "change events" were not "reasonably inferable" scopes of work under the scopes of the trade subcontracts. N.T., *(Footnote Continued Next Page)*

McFadden testified it was not necessary for him to determine the original scope of the trade subcontracts in order to evaluate whether a change in the contract had occurred. N.T., 11/1/21, at 65-66. He clarified he assumed the drawings showed the entire scope of the work. *Id.* As to valuing the amount for Subcontractors to perform under the original scope of the trade subcontracts, he relied upon the budget provided to Subcontractors by Bank. *Id.* He admitted he did not know the specifics of what the budget covered. *Id.* He did not independently value "the original scope of work" in this case. *Id.*

In determining the value of the "change events," McFadden testified that, since Attias did not track his employees' labor costs, McFadden used a computer program to develop the valuation of labor to perform certain job duties. *Id.* at 173-74. He admitted he saw no evidence of the actual cost of Subcontractors to perform the work he analyzed, and, thus, he estimated the

_____

11/1/21, at 108. He admitted that changes from the original scope of work may sometimes include work that is subtracted from the original scope. N.T., 11/1/21, at 64. McFadden considered whether SDSP/WPHS was entitled to a credit for work subtracted from the original scope of the trade subcontracts for only "a couple of instances." *Id.* at 68. He admitted that since he didn't know the specifics of what work the original budget was based on, he was unable to determine in some instances whether SDSP/WPHS would be entitled to a "credit" for work, which was set forth in the original scope of the contracts but then Subcontractors did not need to perform because of a design change. *Id.* at 82. That is, he could not determine whether potential credits to SDSP/WPHS would "meet or exceed the value that he ascribed in his expert report" for the value of the changes that were made by Subcontractors. *Id.*

actual labor to complete tasks. N.T., 11/1/21, at 6. For instance, he was not provided with the hourly rate for Attias' employees' labor. *Id.* at 9. Also, he testified "we did not review actual costs because actual costs records were not available." *Id.* Thus, McFadden admitted he was finding "the potential value" of what the additional work could be. *Id.* at 14. He concluded Attias "provided labor and material in excess of $2,500,000.00 to address the changes made by WPHS/SDSP." *Id.* at 15.

However, he admitted this was an estimate of "potential value" and not "actual value." *Id.* at 16. He testified that Attias' actual costs for labor and materials "could be less; it could be more. I don't know." *Id.* at 23. He also admitted determining costs is "an inexact science," and two different contractors may have different costs for the same job. *Id.* at 21. He specifically acknowledged with the same design plans contractors may seek to do the same work for an amount that varies by millions of dollars. *Id.* He also admitted another expert examining the same items in this case may arrive at a figure different than $2,500,000.00. *Id.* at 22.

He admitted Attias provided him with no internal budget or estimates of what costs he expected to incur during phase one. *Id.* at 7. While he noted the scope of work changed, he was unable to quantify if Attias incurred costs that he originally believed he would not incur. *Id.* However, he surmised that "there is just no way that [Attias] did not incur additional costs to perform his work over his original budgets that he was given to perform this work." *Id.*

McFadden admitted it would have been preferable for Attias to have provided him with actual costs to assist McFadden in determining the additional sums to which Attias might be entitled. *Id.* at 13. He indicated actual costs, which are the underlying basis of the work that was performed, would have assisted him in determining the extent to which changed work occurred in this case. *Id.* McFadden admitted that, based on his opinion as to the value of the "21 changed events," it is possible that SDSP/WPHS might end up overpaying Subcontractors. *Id.* at 14. That is, when asked if it's possible that the values he ascribed to the alleged additional work would result in SDSP/WPHS overpaying, McFadden indicated "[i]t could go either way." *Id.*

Regarding lien waivers, McFadden admitted Attias signed lien waivers, which "basically release the owner for any additional costs for work up through the date of payment."[38] *Id.* at 18.

_____

[38] At this point, SDSP/WPHS asked for a compulsory nonsuit based on insufficient evidence as to damages regarding the July 31, 2018, change orders. N.T., 11/1/21, at 124. They asserted the damages were speculative. *Id.* The trial court denied the motion. *Id.* at 135. They also sought a compulsory nonsuit based on the change orders not being submitted in writing by Attias within five days of the event giving rise to the change, and SDSP/WPHS did not waive its right to notice. *Id.* at 136. The trial court denied this motion. *Id.* at 141. SDSP/WPHS also sought a compulsory nonsuit based on insufficient evidence that Attias fully completed the work under the trade subcontracts so as to be entitled to the retainage fees. *Id.* The trial court denied the motion. *Id.* SDSP/WPHS sought a compulsory nonsuit on the basis Attias did not set forth sufficient evidence for unjust enrichment and, in addition, his unjust enrichment claims were predicated on the same facts as the breach of contract claims. *Id.* at 145. The trial court denied the motion. *Id.* at 150.

William A. Manginelli ("Manginelli"), who was offered as an expert witness in construction-related damages including scope-related change orders by SDSP/WPHS, testified he performed an independent review of McFadden's report, as well as the relevant documents. *Id.* at 159. He testified to a reasonable degree of professional certainty that McFadden's methodology was not sufficient to support the claims to which he testified. *Id.* at 162. Specifically, Manginelli testified McFadden's methodology contained "no analysis of whether or not the changes were, in fact, changes…different than what was required by the [trade] subcontract." *Id.* Manginelli testified that "several of the alleged changes were, in fact, required by the [trade] subcontracts. So, they were not changes." *Id.*

Manginelli testified the methodology to be employed in evaluating scope-related changes is (1) did a change actually occur; (2) if so, determine which party was responsible for the change by examining the parties' contract; (3) determine if there was a cost associated with the change and/or whether the owner should be given a credit for the change; and (4) whether the subcontractor is actually entitled to recovery. *Id.* at 163-64.

Regarding the first prong, Manginelli testified that, in evaluating whether a change actually occurred, an evaluator must determine "what is required by the contracts and then you compare that to what was actually required to be constructed." *Id.* Manginelli opined that, to determine what a trade subcontract requires to be done, an evaluator must utilize the scope of work

document attached to the trade subcontract. *Id.* at 167. That is, if a task is not seen in a referenced drawing, but it is listed as a scope of work item, it is understood that this is within the scope of work of the contract. *Id.* Manginelli opined that since McFadden did not consider this in his analysis, his methodology is flawed. *Id.* He explained the subcontractor is required to perform all work described in the work contract in exchange for a set price. *Id.*

Manginelli opined McFadden's methodology and report was flawed because McFadden did not analyze which party was responsible for any changes. *Id.* at 174. Manginelli noted that changes for which Subcontractors were solely responsible should not be charged against SDSP/WPHS. *Id.* at 177. Such changes include, for example, when a subcontractor makes a change on his own for convenience or because the subcontractor made a mistake that he needed to fix. *Id.* at 179-80.

Manginelli testified that, to determine whether there was a cost associated with a change, an evaluator must first begin with an understanding of how much money in the contract price was intended to cover particular work. *Id.* at 181. He explained an evaluator then looks at what work was actually done, determines how much money was actually expended, and compares this to what the contract price originally provided for the work. *Id.* Manginelli testified some changes cost money for a subcontractor, some changes save money for a subcontractor, and some changes do not cost or

save money for a subcontractor. *Id.* He noted that an owner should not have to pay for items that are already included within the scope of the original work, so depending on the reason for a change (*i.e.*, because a subcontractor made a mistake), an owner should be given a credit. *Id.* at 182.

Manginelli testified it is important to analyze the actual costs, including payroll and material costs. *Id.* at 163. Manginelli explained that his analysis revealed Attias' payroll for his workers totaled $1,316,726.77 for the Project.[39] *Id.* at 184. Manginelli noted SDSP/WPHS paid Attias approximately $6.5 million for his companies' work on the Project. *Id.* at 185. Manginelli "couldn't make up the difference" between Attias' actual labor costs and what SDSP/WPHS paid Subcontractors, so it was not logical for Attias to suggest he was owed "another $2.6 million." *Id.* Manginelli opined that McFadden's analysis was not based on reliable information. *Id.* at 195. He opined McFadden he did not properly determine the original scope of work, the costs associated with any changes, or whether the owner was entitled to any credits.[40] N.T., 11/2/21, at 11.

---

[39] He indicated this included employer contributions and taxes. *Id.* at 184.

[40] At the end of all testimony, SDSP/WPHS made a motion for a directed verdict as to Subcontractors' claims accruing prior to February 9, 2018, which is the date Attias executed twelve lien waivers and releases for which he was paid $130,000.00. N.T., 11/2/21, at 41. The trial court denied the motion. *Id.* at 52.

By order entered on January 21, 2022, the trial court entered its verdict on the outstanding claims as follows: (1) Count I of SDSP's complaint-claim for breach of contract against Subcontractors, the court found in favor of Subcontractors and against SDSP; (2) Count III of SDSP's complaint-claim for conversion against Attias, individually, the court found in favor of SDSP and awarded it $75,000.00 related to the removal of kitchen cabinets; (3) Count V of SDSP's complaint-claim for unjust enrichment against Subcontractors, the court found in favor of Subcontractors and against SDSP/WPHS; (4) Count II of Subcontractors' complaint-claim for breach of contract against SDSP, the court found in favor of SDSP since Subcontractors were fully paid for the in-scope work of the contracts at issue; (5) Count III of Subcontractors' complaint-claim for violations of the Payment Act, the court found in favor of SDSP/WPHS; (6) Count IV of Subcontractors' complaint-claim for unjust enrichment against WPHS, the court found in favor of Subcontractors and against WPHS in the amount of $2,679,940.00.  The trial court found that Subcontractors were not paid for the out-of-scope and not reasonably inferable work based on the contracts at issue; (7) Count V of Subcontractors' complaint-a claim for quantum merit against WPHS, the court found in favor of WPHS.  Trial Court Order, filed 1/21/22, at 1-2.  The trial court ordered "all

other remaining claims are hereby dismissed."[41] *Id.* The trial court filed an opinion in support of its order on January 27, 2022.

On February 2, 2022, SDSP/WPHS filed a timely post-trial motion,[42] and on February 11, 2022, Subcontractors filed a timely post-trial motion. *See* Pa.R.Civ.P. 227.1(c) (relating to the filing of initial and cross post-trial motions). By orders entered on March 8, 2022, and March 9, 2022, the trial court denied the post-trial motions. On March 14, 2022, the trial court entered judgment in favor of Moses Construction, Eden Plumbing, and AAA Demo and against WPHS in the amount of $3,227,079.59 on the court's order dated 3/8/22. On March 17, 2022, the trial court entered judgment in favor of SDSP/WPHS and against Attias, individually, in the amount of $75,000.00 regarding the conversion claim.

On April 10, 2022, SDSP/WPHS filed a separate timely notice of appeal for each lower court docket number, and by order entered on April 11, 2022, the trial court directed SDSP/WPHS to file a Pa.R.A.P. 1925(b) statement.

---

[41] We note that, although the order was filed on January 21, 2022, the docket entries reveal notice was not provided to the parties until January 24, 2022. *See Smithson v. Columbia Gas of PA/NiSource*, 264 A.3d 755 (Pa.Super. 2021) (holding Pa.R.Civ.P. 236(b) requires the prothonotary to note on the docket the date the parties are given notice of an order and the computation of time begins from the date of notice).

[42] On February 3, 2022, Subcontractors filed a motion to mold the verdict to include pre-judgment interest, which the trial court granted on March 8, 2022.

SDSP/WPHS filed a timely Rule 1925(b) Statement on May 2, 2022. The trial court filed a brief Rule 1925(a) opinion indicating it was relying on its January 27, 2022, opinion.

On April 20, 2022, Subcontractors filed a separate timely cross-appeal for each lower court docket number.[43] **See** Pa.R.A.P. 902(b). The trial court did not direct Subcontractors to file a Rule 1925(b) statement, and consequently, they did not file one.

On appeal, SDSP/WPHS set forth the following issues in their "Statement of Questions Presented" (verbatim):

A. Whether the trial court erred and/or abused its discretion in failing to grant JNOV and refusing to vacate an unjust enrichment award against the owner of a construction project where (i) the subcontractors in whose favor the award was entered failed to prove that the owner independently requested work from, or misled, them, and thus, failed to prove liability for unjust enrichment, and (ii) the subcontractors failed to prove an increase in value of the owner's property to establish that the owner sustained a "benefit" under Pennsylvania law?

B. Whether the trial court erred and/or abused its discretion by failing to grant JNOV and vacate an award of $2,679,940.00 in unjust enrichment damages against an owner of property in circumstances where the subcontractors acknowledged they were paid by the contractor and expressly waived any right to assert mechanics' liens against the property in exchange for payment?

C. Whether the trial court erred and/or abused its discretion by failing to grant JNOV and vacate an award of $2,679,940.00 unjust enrichment award to subcontractors based solely on subcontractors' expert's estimates regarding the cost of work performed where the estimates were non-probative, wholly

---

[43] The initial notices of appeal, as well as the cross-appeal, for both trial court docket numbers were consolidated by this Court.

lacking in foundation, and, thus, the award based on the expert's testimony was inherently speculative?

D. Whether the trial court erred in failing to award an owner and general contractor their reasonable attorneys' fees and costs under Section 512(b) of the Pennsylvania Contractor and Subcontractor Payment Act, 73 P.S. 501 et seq. ("CASPA") where attorneys' fees and costs to a "substantially prevailing party" are mandatory, the contractor prevailed on all the claims asserted against it and—the owner prevailed on its conversion claim?

SDSP/WPHS's Brief at 4-5.

In their cross-appeal, Subcontractors set forth the following issues in their "Statement of Questions Presented" (verbatim):

1. Whether the trial court erred as matter of law and/or abused its discretion by failing to award approximately $1,113,793.00 in damages to the Subcontractors for the in-scope work they performed under Trade Contracts and billed through the Payment Applications, and for which SDSP received payment from its lender?

2. Whether the trial court erred as a matter of law and/or abused its discretion by failing to award the Subcontractors' interest, penalty, and attorney's fees under CASPA?

Subcontractors' Brief at 4-5.

Issues one, two, and three presented in SDSP/WPHS's brief are interrelated. WPHS challenges the following portion of the trial court's order:

(6) Count IV of [Subcontractors'] complaint-a claim for unjust enrichment against WPHS[,] the court finds in favor of [Subcontractors] and against WPHS…in the amount of $2,679,940.00. It is the [trial] court's finding that [Subcontractors] were not paid for the out-of-scope and not reasonably inferable work based on the contracts at issue[.]

Trial Court Order, filed 1/21/22, at 2.

Specifically, WPHS contends the trial court erred in denying its motion for a judgment notwithstanding the verdict ("JNOV") since Subcontractors failed to establish the elements necessary for an unjust enrichment claim against WPHS, who is the owner of the Project.[44]

> When reviewing a motion for JNOV the evidence must be viewed in the light most favorable to the verdict winner, who must be given the benefit of every reasonable inference of fact. ***Fanning v. Davne***, 795 A.2d 388, 392 (Pa.Super. 2002) (quotation omitted). Any conflict in the evidence must be resolved in the verdict winner's favor. ***Id.*** JVOV may be entered: (1) where the moving party is entitled to judgment as a matter of law, or (2) where the evidence was such that no two reasonable minds could disagree that the outcome should have been in favor of the moving party. ***Id.*** at 393.

> On appeal of a trial court's denial of a motion for JNOV, our Court will reverse the trial court only upon a finding of an abuse of discretion or error of law that controlled the outcome of the case. ***Eichman v. McKeon***, 824 A.2d 305, 311 (Pa.Super. 2003) (citation omitted). Additionally, where credibility and the weight to be accorded the evidence are at issue, this Court will not

---

[44] As indicated *supra*, SDSP/WPHS made a request for compulsory nonsuit on the basis Subcontractors did not establish the elements for unjust enrichment, and the trial court denied the request. N.T., 11/1/21, at 145, 150. ***See Phelps v. Caperoon***, 190 A.3d 1230 (Pa.Super. 2018) (holding that ordinarily to preserve the right to request JNOV a party must request a directed verdict or compulsory non-suit during trial). Thereafter, SDSP/WPHS adequately raised the claim in their post-trial motion and court-ordered Rule 1925(b) statement. ***See Rubin v. Stewart***, ___ A.3d ___, 2023 WL 2003961 (Pa.Super. filed 2/15/23) (unpublished memorandum) (declining to find JNOV issue waived where same arguments were raised in a request for compulsory non-suit, post-trial motions, and Rule 1925(b) statement); Pa.R.A.P. 126(b)(2) (effective May 1, 2019, unpublished memorandum may be cited for persuasive value).

substitute its judgment for that of the fact-finder. *Id.* at 311-12 (citation omitted).

**Francis v. LCP North Third, LLC**, 2023 PA Super 39, 2023 WL 2487260, at *3 (Pa.Super. filed 3/14/23).

To prevail on an unjust enrichment claim, which is an equitable doctrine, the plaintiff must demonstrate the following elements:

> [W]e have described [the elements for unjust enrichment] as "[(1)] benefits conferred on defendant by plaintiff, [(2)] appreciation of such benefits by defendant, and [(3)] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." **Schenck v. K.E. David, Ltd.**, 666 A.2d 327, 328 (Pa.Super. 1995)....The critical inquiry in the application of this doctrine is whether a defendant has been unjustly enriched. **Id.** "Where unjust enrichment is found, the law implies a contract, referred to as either a *quasi contract* or a contract implied in law, which requires that the defendant pay to plaintiff the value of the benefit conferred." **Id.**

**Karden Construction Services, Inc. v. D'Amico**, 219 A.3d 619, 629 (Pa.Super. 2019). Thus, "where one party has been unjustly enriched at the expense of another, he is required to make restitution to the other. In order to recover, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied...." **Meehan v. Cheltenham Township**, 410 Pa. 446, 189 A.2d 593, 595-96 (1963).

> Section 110 of the Restatement of Restitution deals with the situation where a third-party benefits from a contract entered into

between two other parties.[45]  It provides that, in the absence of some misleading by the third party, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third party.

**Meehan**, **supra**, 189 A.2d at 595-96 (footnote added).

Our Supreme Court has examined construction-related cases where a subcontractor has sought reimbursement from a third party under the theory of unjust enrichment.  Specifically, in **Meehan**, **supra**, a developer subcontracted with another to install streets and sewers in his development but became insolvent before he paid the subcontractor. Subsequently, the sewers and streets were dedicated to the township, and after the subcontractor unsuccessfully attempted to establish a mechanics' lien on the improvements, he sued the township on a theory of unjust enrichment, seeking more than $17,000.00, the value of his materials and labor. **See id.**

In denying the subcontractor's claim of unjust enrichment, the Supreme Court held "[the] subcontractor cannot merely allege its own loss as the measure of recovery—*i.e.*, the value of labor and materials expended—but

_____

[45] This Court has held "[t]he doctrine of unjust enrichment is clearly inapplicable when the relationship between the parties is founded on a written agreement or express contract." **Roman Mosaic & Tile Co. v. Vollrath**, 313 A.2d 305, 307 (Pa.Super. 1973).  Here, the trade subcontracts were executed between SDSP (the general contractor) and Subcontractors. However, Subcontractors are seeking to invoke the doctrine against an entity, WPHS (the owner of the Project), who was not a party to the trade subcontracts.

instead must demonstrate that appellee [the township] has in fact been benefitted." *Meehan*, *supra*, 189 A.2d. at 595.

This Supreme Court also held that, even if the subcontractor had shown the township received a benefit, it had not demonstrated that the township's retention of the benefit without compensating the subcontractor was unjust. *See id.* In sum, the Supreme Court has held that in a case where a subcontractor has provided services and chattels to an owner who had no direct contractual relationship to the subcontractor, (1) any benefit conferred must, for purposes of recovery on an unjust enrichment theory, be measured by the value of the benefit to the owner, not by the value of the invoice submitted by the subcontractor; and (2) the owner's retention of the benefit without paying any compensation to the subcontractor would not be unjust if the owner did not contract directly with, request, or mislead the subcontractor. *Id.*

In *D.A. Hill Co. v. Clevetrust Realty Investors*, 524 Pa. 425, 573 A.2d 1005 (1990), our Supreme Court addressed another unjust enrichment claim brought by a subcontractor against a third-party. In *D.A. Hill*, an investment company provided a construction loan, secured by a mortgage, to a developer to build a shopping mall. *Id.* at 1006. The developer hired a general contractor, who in turn hired the plaintiff as a subcontractor. *Id.*

After construction began, the development company defaulted on its loan by failing to make a mandatory interest payment. *Id.* at 1007. In

accordance with its rights under the loan agreement, the investment company refused to disburse additional funds, the general contractor received no money, and the subcontractor was left without compensation for its work. ***Id.*** Eventually, the investment company foreclosed on the property. ***Id.*** The subcontractor then brought suit against the investment company on the theory that the investment company had been unjustly enriched by the subcontractor's work. ***Id.*** at 1008.

Our Supreme Court found that, in order to prevail, the subcontractor would have had to demonstrate that the investment company was enriched, and that such enrichment was unjust. ***Id.*** at 1009. The Court reiterated that "enrichment is measured by the value of the benefit to the owner, not by the value of the invoice submitted by the subcontractor." ***Id.  See Meehan***, ***supra***, 189 A.2d. at 595 (subcontractor "cannot merely allege its own loss as the measure of recovery—*i.e.*, the value of labor and materials expended— but instead must demonstrate that the owner has in fact benefited.")[.]

Furthermore, the Supreme Court reiterated the enrichment would only be considered unjust if the owner had requested the benefit, contracted directly with, or misled the subcontractor. ***D.A. Hill, supra***, 573 A.2d at 1009. The Supreme Court ruled in favor of the investment company, finding that the subcontractor failed to establish the existence of a benefit at the time of foreclosure. ***Id.*** at 1010.

In the case *sub judice*, the trial court concluded WPHS (the owner of the Project) was unjustly enriched because Subcontractors completed work outside the scope of the trade subcontracts for which SDSP (the general contractor) did not pay. Finding Attias' testimony credible, the trial court concluded Subcontractors "completed work constituting major and substantial changes not in the September 2015 drawings which was the basis of the initial agreement." Trial Court Opinion, filed 1/27/22, at 15. The trial court found the changes were "beyond work reasonably inferred" from the scope of work in the eleven trade subcontracts. *Id.*

The trial court then accepted as credible the eleven July 31, 2018, change orders submitted by Attias and concluded that, although the change orders were based on "estimates," the change orders reflected the cost of labor/materials expended by Subcontractors for the changes. Thus, based thereon, the trial court concluded WPHS was benefited by the labor/materials set forth in the change orders. After a careful review, we agree with WPHS that this was error.

In order for Subcontractors to have established an unjust enrichment claim against WPHS, it is axiomatic that they must have established a benefit or enrichment was conferred upon WPHS.[46] *See Karden Construction*

_____

[46] We note the trial court mistakenly concluded WPHS was solely co-owned by Bank and Foster. Trial Court Opinion, filed 1/27/22, at 2-3. The trial court concluded "Fifty percent of WPHS was owed by Bank and the other fifty
*(Footnote Continued Next Page)*

*Services, Inc.*, *supra*. In answering this inquiry in the affirmative, the trial court relied on the July 31, 2018, change orders. The trial court noted the change orders reflected Attias (the subcontractor) billed SDSP (the general contractor) approximately $2,679,940.00 for the cost of labor/materials for various changes. The trial court essentially concluded that since Attias billed SDSP to make the changes, WPHS (the owner of the Project) must have benefited, and the trial court used the change orders to measure the amount of the benefit.

However, it is well settled that, for unjust enrichment actions against owners in construction cases, the existence of an enrichment is determined by the value of the benefit to the owner, not by the value of the invoice submitted by the subcontractor. *Id.* Here, Subcontractors did not produce evidence of whether/how the value of WPHS's property was increased or enhanced due to the changes. Moreover, Subcontractors' expert, McFadden, who the trial court found credible, admitted that if WPHS paid for the July 31, 2018, change orders, it is "possible" that WPHS would "overpay" for any value it received from the work described in the change orders.[47] N.T., 11/1/21, at

_____

percent was owned by Foster[.]" *Id.* at 9. However, the undisputed evidence reveals a tax credit investor holds a 99% interest in WPHS while Bank and Foster each own half of one percent (.5%) equity interest. N.T., 10/13/21, at 21.

[47] As it related to the July 31, 2018, change orders, McFadden noted he was unable to determine whether Attias' labor/material costs set forth in the
*(Footnote Continued Next Page)*

14. He specifically admitted he did not perform an overall value of the original scope of the work, and he did not credit the owner with changes that may have provided less benefit or value to the owner. *Id.* at 65-66, 79-80. He admitted he did not determine whether the work in the July 31, 2018, change orders would meet or exceed the value to the owner as set forth in the original trade subcontracts for work to be completed. *Id.* at 86. He admitted the owner, WPHS, might "possibly" be entitled to an offset for items because the value to WPHS from the change orders was less than the value would have been if the trade subcontract was completed as is. *Id.* He also admitted the amount of labor charged by Subcontractors in the July 31, 2018, change orders did not necessarily correspond to the value received by WPHS. *Id.* at 87.

Accordingly, viewing the evidence in the light most favorable to Subcontractors, the record reveals the trial court erred in holding the work associated with the July 31, 2018, change orders reflected a benefit to WPHS as is required for an unjust enrichment claim. *See Francis*, *supra*. Thus, we reverse the trial court's order pertaining to the finding of unjust enrichment

---

change orders were even "over and above what [he] initially planned to spend to perform the original scope of work of the Project." N.T., 11/1/21, at 6-7. He also admitted some changes were "non-compensable changes." *Id.* at 34-35.

- 62 -

in favor of Subcontractors and vacate the March 14, 2022, judgment with regard thereto.[48]

We next address the claim presented by Subcontractors in their cross-appeal. Subcontractors challenge the following portion of the trial court's order:

> (4) Count II of [Subcontractors'] complaint-a claim for breach of contract against SDSP…, the [trial] court finds in favor of SDSP and against [Subcontractors]. It is the [trial] court's finding that [Subcontractors] were fully paid for the in-scope work of the contracts at issue.

Trial Court Order, filed 1/21/22, at 2.

In developing their argument on appeal, Subcontractors present a challenge to the weight of the evidence. Specifically, they assert "[t]here can be no question that on th[e] evidentiary record, the Subcontractors proved all of the requisite elements necessary to establish their breach of contract claim. Any finding to the contrary was against the weight of the evidence." Subcontractors' Brief at 68.

However, in their post-trial motion, Subcontractors did not present a weight of the evidence claim as to the trial court's verdict regarding their breach of contract claim. Rather, they sought and developed in the post-trial motion a JNOV claim, which is distinct from a weight of the evidence claim.

---

[48] We note WPHS developed additional arguments on appeal in support of its contention the trial court erred in finding in favor of Subcontractors with regard to their unjust enrichment claim. However, given our analysis *supra*, we find it unnecessary to address these arguments.

*See Corvin v. Tihansky*, 184 A.3d 986 (Pa.Super. 2018) (discussing JNOV and weight claims). Thus, we find Subcontractors' weight of the evidence clam to be waived. *See Bensinger v. Univ. of Pittsburgh Medical Center*, 98 A.3d 672 (Pa.Super. 2014) (holding a challenge to the weight of the evidence is waived if not raised in a post-trial motion); Pa.R.Civ.P. 227.1.[49]

Finally, SDSP/WPHS assert the trial court erred in failing to award it attorney's fees and costs under Section 512 of the Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. § 512. Similarly,

---

[49] Assuming, *arguendo*, Subcontractors alternatively presented on appeal and preserved a claim the trial court should have entered JNOV in their favor as to the breach of contract claim, we find no relief is due. Subcontractors claim they were not fully paid for the in-scope work of the trade subcontracts, and in support thereof, they contend SDSP did not pay the February and March of 2018 payment applications. Thus, they claim a breach of contract. However, the trial court found credible Bank's testimony that the payment applications paid by SDSP, plus the $40,000.00 weekly payments and other lump sum payments, resulted in SDSP paying in excess of what Subcontractors were owed under the trade subcontracts. Bank testified SDSP paid Subcontractors $6.2 million, which was approximately $360,000.00 more than what they were entitled to under the trade subcontracts as amended by change orders. Bank testified Subcontractors were fully paid for all of the work they completed, and, in fact, they were paid in advance for work; however, he noted Subcontractors did not fully complete the work under the trade subcontracts. N.T., 10/19/21, at 87. Thus, viewing the evidence in the light most favorable to SDSP as the verdict winner, we conclude the trial court properly concluded no relief was due to Subcontractors as would warrant a JNOV in their favor. *See Hart v. Arnold*, 884 A.2d 316, 332 (Pa.Super. 2005) (to prove a breach of contract the plaintiff must establish a contract, including its essential terms, a breach of the duty imposed by the contract, and resultant damages). *See also Francis*, *supra* (setting forth JNOV standard of review).

Subcontractors contend the trial court erred in failing to award interest, attorney's fees, and costs to them under Section 512.

Initially, we note Subcontractors have waived their claim under CASPA. Subcontractors presented a claim under CASPA in their complaint; however, the trial court ruled against Subcontractors and in favor of SDSP/WPHS on the claim. Subcontractors presented no challenge to the trial court's ruling in their post-trial motion.[50] **See** Pa.R.Civ.P. 227.1.

Turning to SDSP/WPHS's claim for attorney's fees and costs under Section 512(b) of CASPA,[51] we conclude relief is due.

SDSP/WPHS contend they are entitled to attorney's fees and costs under Section 512(b) because they are the "substantially prevailing party" in an

_____

[50] While Subcontractors filed a post-trial motion to mold the verdict to include pre-judgment interest, the motion did not seek interest under CASPA; but rather, Subcontractors sought interest under 41 P.S. § 202.

In any event, as Subcontractors have no valid claim for payment, they are not entitled to penalties, attorney's fees, or expenses with regard thereto. **See** 73 P.S. § 512(a), (b).

[51] SDSP/WPHS raised their claim for attorney's fees and costs under CASPA for the first time in their post-trial motion. We agree with SDSP/WPHS that they adequately preserved their claim. **See Zavatchen v. RHF Holdings, Inc.**, 907 A.2d 607 (Pa.Super. 2006) (holding defendants in a CASPA claim may seek attorney's fees and costs if they are the "substantially prevailing party" in the plaintiff's CASPA matter). **See also Lomas v. Kravitz**, 130 A.3d 107 (Pa.Super. 2015) (rejecting argument that prevailing party was not entitled to attorney's fees and costs for failing to include claim in original pleading). Here, in their cross-complaint, Subcontractors (as plaintiffs) presented a claim for payment under CASPA, and the trial court found in favor of SDSP/WPHS (as defendants) and against Subcontractors.

action for which payment was sought under CASPA. SDSP/WPHS's claim

requires us to examine Section 512(b), and thus, our standard of review is as

follows:

> When determining the meaning of a statute, a court must construe the words of that statute according to their plain meaning. 1 Pa.C.S.A. § 1903(a)[.] When the words of a statute are clear and free from all ambiguity, they are not to be disregarded under the pretext of pursuing the spirit of the statute. 1 Pa.C.S.A. § 1921(a)[.] It is only when the statute is unclear that the court may embark upon the task of ascertaining the intent of the legislature. Absent a definition, statutes are presumed to employ words in their popular and plain everyday sense, and popular meanings of such words must prevail.

***Zimmerman v. Harrisburg Fudd I, L.P.***, 984 A.2d 497, 501 (Pa.Super.

2009) (case citations and original brackets omitted).

> This Court has recognized:

> CASPA is a comprehensive statute enacted in 1994 to cure abuses within the building industry involving payments due from owners to contractors, contractors to subcontractors, and subcontractors to other subcontractors. The underlying purpose of CASPA is to protect contractors and subcontractors and to encourage fair dealing among parties to a construction contract. The statute provides rules and deadlines to ensure prompt payments, to discourage unreasonable withholding of payments, and to address the matter of progress payments and retainages. Under circumstances prescribed in the statute, interest, penalties, attorney's fees, and litigation expenses may be imposed on an owner, contractor, or subcontractor who fails to make payment to a contractor or subcontractor in compliance with the statute.

***E. Allen Reeves, Inc. v. Old York, LLC***, ___ A.3d ___, 2023 WL 2921091

(Pa.Super. 2023) (quoting ***El-Gharbaoui v. Ajayi***, 260 A.3d 944, 954

(Pa.Super. 2021) (citation and brackets omitted)).

Relevantly, Section 512 of CASPA provides as follows:

**(b) Award of attorney fee and expenses.--**Notwithstanding any agreement to the contrary, the substantially prevailing party in any proceeding to recover any payment under this act shall be awarded a reasonable attorney fee in an amount to be determined by the court or arbitrator, together with expenses.

73 P.S. § 512 (bold in original).

This Court has held that, while the mandatory language in the attorney fee provision of CASPA requires an award of attorney's fees and expenses to a "substantially prevailing party," including a defendant of a CASPA claim, the issue of whether any party to a lawsuit substantially prevailed is left to the trial court's discretion. ***Zavatchen***, ***supra***.

This Court has noted:

A "prevailing party" is commonly defined as:

[A] party in whose favor a judgment is rendered, regardless of the amount of damages awarded. While this definition encompasses those situations where a party receives less relief than was sought or even nominal relief, its application is still limited to *those circumstances where the fact finder declares a winner and the court enters judgment in that party's favor.*

***Zavatchen***, 907 A.2d at 610 (emphasis added) (quotation omitted).

To qualify as a *substantially* prevailing party under CASPA, a party need not only recover on its claim, but also prove the opposing party, without good faith reason, failed to comply with the mandate of prompt payment. ***Id.*** at 609.

Here, we agree with SDSP/WPHS that it was the substantially prevailing party under CASPA. The trial court found that SDSP/WPHS timely paid Subcontractors for the in-scope work under the trade subcontracts, and thus,

denied Subcontractors' claim for relief under CASPA. Further, as indicated *supra*, in examining the unjust enrichment claim, we conclude Subcontractors failed to establish they were entitled to additional payments for alleged out-of-scope work. Simply put, SDSP/WPHS is the party in whose favor a judgment has been rendered, and there is no evidence they failed to comply with the mandates of prompt payment to Subcontractors. Thus, we conclude the trial court erred in failing to award SDSP/WPHS attorney's fees and expenses under Section 512(b) of CASPA, and thus, we remand for the trial court for further proceedings as to the issue.

For all of the foregoing reasons, we reverse the trial court's order entered on January 21, 2022, on Count IV of Subcontractors' complaint in which the trial court held WPHS was unjustly enriched and awarded Subcontractors $2,679,940.00 with regard thereto. Moreover, we conclude SDSP/WPHS is entitled to attorney's fees and expenses under Section 512(b) of CASPA. We affirm the trial court's January 21, 2022, order in all other respects. However, given our disposition, we vacate the judgment entered on March 14, 2022, and remand for further proceedings consistent with this decision.

Since no issue was raised as to the March 17, 2022, judgment regarding Attias' conversion when he removed the kitchen cabinets, we affirm this judgment.

Order reversed in part and affirmed in part. March 14, 2022, judgment vacated and remanded for further proceedings. March 17, 2022, judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/20/2023